**F. W. WOOLWORTH CO. v. FEDERAL INV. CO.** *

(Circuit Court of Appeals, Eighth Circuit. April 30, 1925.)

No. 6706.

1. **Landlord and tenant ⬳158—Jury's findings that plans and specifications for building submitted by tenant were final held binding in view of evidence.**

Jury's findings that plans and specifications submitted by tenant and used by landlord in constructing building for tenant were final plans and specifications, within meaning of lease contract, *held* conclusive, in view of evidence, in landlord's action to recover of tenant cost of changes subsequently made.

*Rehearing denied July 31, 1925.

**2. Landlord and tenant ⊖⇒158—Landlord cannot ordinarily recover of tenant cost of improvements made during term.**

Ordinarily landlord cannot recover of tenant cost of improvements made during term, unless latter expressly agrees to pay therefor.

**3. Landlord and tenant ⊖⇒158—Implied, constructive, or quasi contract on part of tenant to pay for changes in building being constructed for it held sufficiently shown to go to jury; "implied contract."**

Landlord, suing tenant to recover cost of changes made in building being constructed for tenant, after tenant had submitted final plans and specifications, *held* to have made question for jury, as to an implied, constructive, or quasi contract on part of defendant to pay for such improvements; "implied contract" being ordinarily inclusive of both quasi or constructive contracts.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Implied Contract.]

**4. Appeal and error ⊖⇒1050(1)—Error in admission of testimony, if not waived by adverse party's submission of like testimony, held not prejudicial.**

In landlord's action to recover of tenant cost of changes in building being constructed for it, error in permitting witness for plaintiff to testify that he had assumed tenant would pay for changes, if it wanted them made, if not waived by defendant's introduction of similar evidence to effect that it had expected building would be constructed according to specifications, and had not intended to pay for such improvements, *held* not prejudicial.

In Error to the District Court of the United States for the District of Minnesota; William A. Cant, Judge.

Action by the Federal Investment Company against the F. W. Woolworth Company. Judgment for plaintiff, and defendant brings error. Affirmed.

F. H. Stinchfield, of Minneapolis, Minn. (Jamison, Stinchfield & Mackall, of Minneapolis, Minn., on the brief), for plaintiff in error.

Charles Burke Elliott, of Minneapolis, Minn. (Elliott, Doll & Coursolle, of Minneapolis, Minn., on the brief), for defendant in error.

Before SANBORN and LEWIS, Circuit Judges, and POLLOCK, District Judge.

LEWIS, Circuit Judge. In the main this action presents the issue as to which of the parties was liable to pay the cost of changes made in a building which the Federal Investment Company, plaintiff below, constructed for occupancy by the F. W. Woolworth Company as its tenant. The other claims made by the Investment Company, based on delay in completing the building because of the time taken to make the changes, will be pointed out later.

The Investment Co. held an option for a 99-year lease on premises fronting 46 feet on Nicollet Avenue, Minneapolis, on which there was an old building. Negotiations were carried on in the early part of 1921 between Mr. White, representing the Investment Co., and Mr. Mickler, representing the Woolworth Co., which resulted in a contract between the two companies, by the terms of which Investment Co. agreed to construct and did construct a new building on the premises to be occupied by the Woolworth Co., for a term of 25 years and 6 months at an agreed rental, the lease term to end, however, on May 1, 1947. The contract was in the form of a letter bearing date June 15, 1921, addressed by Woolworth Co. to Investment Co., to which was attached the proposed lease agreement. Both the letter and lease were prepared by the Investment Co. In this letter the Woolworth Co. said:

"* * * We hereby agree that if you will have constructed upon said premises, in the place of the present building, a two story and basement fireproof store building (substantially as per preliminary sketches heretofore submitted, and for which building we will submit complete working drawings and specifications), we will enter into a lease, effective from the date said building is completed, said lease to be according to the terms and conditions of the form hereto attached, and made a part hereof, the rental from the date of possession to be at the rate of $25,000.00 per annum.

"The work of wrecking the present building and the construction of the new building to begin on August 1, 1921, or as soon thereafter as it can be reasonably done, and to be completed and ready for occupancy on November 1, 1921, or as soon thereafter as the conditions then and there existing shall warrant, it being the intent that you shall use all due diligence in completing said building as rapidly as possible.

"We agree to furnish you with completed working drawings and specifications from time to time as may be necessary in order not to delay the construction work of said building, and sufficient detailed drawings and specifications on or before June 25, 1921, so that you can get accurate figures on the cost of said new building."

The Investment Co. put its acceptance of the proposal on the letter thus:

"F. W. Woolworth Company, Minneapolis, Minnesota.

"We hereby accept the above proposition, subject to the completed plans for the building being satisfactory to us as to construction and costs."

Woolworth Co.'s agent at Minneapolis sent this letter, with the lease attached, to Woolworth Co.'s New York office, where the letter was signed and the lease executed by the Woolworth Co., and it returned them to its Minneapolis agent. At the same time (June 27) it sent its Minneapolis agent this telegram, copy of which was delivered to Investment Co. on June 28th:

"Lease Nicollet Avenue and letter June fifteenth to Federal Investment Company signed and posted today but plans and specifications not approved as we have decided not to let off any office space and instead have salesroom on second floor and stock room in basement this revised scheme will work out more satisfactorily also will decrease cost of construction posting letter today showing revised requirements so you can start detail plans and specifications."

Before Investment Co. formulated the letter and proposed lease Woolworth Co. had its architect at Minneapolis prepare preliminary plans, mentioned in the letter of June 15th, for the building it desired, and submitted them to Investment Co. so that it could get an approximate estimate of what the building would cost. The estimates obtained were about $50,000.00. Then the letter and lease were delivered to Woolworth Co.'s agent. When Woolworth Co. signed the letter and lease at its New York office it had there a copy of the preliminary plans on which the Investment Co. had gotten the approximate cost of the new building. On receipt by Investment Co. of a copy of the telegram, quoted above, from the Woolworth Co.'s representative at Minneapolis, the Investment Co. took up its option on the premises, notified tenants in the old building to vacate and let a contract for the wrecking and removal of that building. Mr. Weaver, Woolworth Co.'s architect at Minneapolis, complying with directions in the telegram, began preparation of detailed plans and specifications for the new building, completed them, blue-printed nine sets of them and gave seven of those sets to Mr. White, president of Investment Co., about the last of July or first of August. On August 3d Mr. White wrote to six or seven contractors in the city to call at his office and get the plans and specifications for the new building, if they cared to bid on the work, and said that all bids must be in on August 17th. Mr. Hegg's bid was accepted, and on August 22d he entered into a contract with the Investment Co. to construct the building, in accordance with those plans and specifications, for $50,850.00. After the plans and specifications were delivered to Investment Co., on which it took bids, changes were made in those plans and specifications by Mr. Weaver, at the request of Woolworth Co.'s New York office. Those changes were handed to Investment Co. and were made in the building, it paid the extra cost therefor, and it was to recover that cost that the Investment Co. sued in its first cause of action. The rental was to begin when the building was completed and Woolworth Co. took possession, and the second cause of action was for loss of rent, $1,716.67, during delay in completing the building, because of the extra time taken in making the changes. Under the lease, in addition to $25,000.00 annual rental, which was to be paid in equal monthly installments, Woolworth Co. also agreed to pay Investment Co. a fixed sum of $5,000.00 per annum in lieu of additional rent and taxes which might be assessed against the property during the term. The third cause of action was for recovery of a proportionate part, $424.66, of this sum during delay in making the changes. The building was not complete for occupancy until in February, 1922. Investment Co. paid the contractor $7,456.32 for making the changes, demanded payment of that and the other amounts sued for from Woolworth Co., which was refused, and thereupon brought this suit and recovered a verdict and judgment of $5,285.73 on October 24, 1923.

Before answering, however, defendant challenged the sufficiency of the complaint by demurrer; and the District Judge, in overruling the demurrer, said:

"The complaint is evidently framed upon the theory of an implied contract. It conforms to the requirements of such a pleading under the Minnesota practice. Lufkin v. Harvey, 125 Minn. 458, 147 N. W. 444, and cases therein cited. Whether there was in fact such a contract between the parties, must depend upon all of the facts and circumstances which may be disclosed by the evidence. Lombard v. Rahilly, 127 Minn. 449, 149 N. W. 950."

The changes in the plans appear to have been ordered in two communications from the New York office to Mr. Weaver, one of date July 30th and the other August 25th. They were made on the plans and specifications by Mr. Weaver, returned to New York

and finally approved there late in September. Mr. Weaver testified that the plans and specifications which he gave Mr. White the last of July or first of August were complete in all respects, that a contractor could complete the building from those plans and specifications, and that the changes were all made after he gave them to Mr. White, and some of them after the contract was made with Hegg. Mr. White admitted that he knew that whatever was done by the agents of Woolworth Co. at Minneapolis was subject to approval or disapproval by the New York office, but his position in behalf of Investment Co. was that in view of the terms of the contract, the statements in the telegram, supra, from Woolworth Co., the delivery to him of complete plans and specifications for the new building, on which to take bids for its construction, and the acceptance of Hegg's bid, the status and relation of the parties to each other thereupon became fixed; that the Investment Co. bound itself in a contract with Hegg for the construction of the building for a named sum in accordance with the plans delivered to it; that the changes made were not further details in explanation of the plans that had already been submitted, but they were physical changes in the building itself, and that those changes added nothing to the value of the property but were made to suit the pleasure and convenience of Woolworth Co. He testified that they were all called to his attention by Mr. Weaver after the contract was made with Hegg; and that he had no recollection of any of these changes being called to his attention until after September 20th, which was the date stamped on the changed plans as the approval date by the New York office. Hegg testified that the first he knew of the changes to be made was on August 29th, when Mr. White wrote him on that date about some of them. The letter from White was introduced in evidence. Hegg said he procured the building inspector's approval of the plans on October 4th, which then embodied most of the changes but not all of them. The plans and specifications had been revised up to that time, showing about 60 per cent of the changes. Other changes were made later. Mr. Weaver testified that the changes made, and here sued for, were embodied in two letters from the New York office, one of July 30th and the other of August 25th, and that both letters were shown to Mr. White shortly after they were received, and that work on construction of the new building had not then started. He made the changes by rewriting the specifications covering the subjects. In his opinion some of the changes cut down the expense and some added to the expense of construction, and there was in his judgment about an even balance between them. When he gave the seven copies of the plans and specifications to White he knew White got them for the purpose of getting bids on them, but he did not know that White was going to close a contract. They were complete sets of drawings and specifications for a complete building. After Weaver made the changes on the plans he gave to White corrected sheets showing the changes, and White directed Hegg to make them in the building. At no time while the building was under construction, nor until White demanded from Woolworth Co. payment for the changes in February, 1922, was anything said as to which party would pay for the changes, or be liable therefor. The changes were requested and made in the manner stated, without more. The evidence was in conflict as to whether the changes added to the permanent or sale value of the building. Plaintiff's evidence was to the effect that the building was planned to suit defendant's special needs, and it was not conveniently adaptable to other uses, that its useful life would not be but little, if any more, than the lease term, and that the changes did not add to the property interests of the lessor; that of defendant was contra. Thus there was controversy between the parties, right determination of which rested in large part on parol, as to whether the plans and specifications, on which bids were taken and construction contract let, should be regarded as the final plans and specifications; and if they were it became a question of law whether the defendant was liable to plaintiff for the amount expended in making the changes at defendant's request. It is admitted that working drawings are but amplifications of the plans and specifications, to be gotten out as construction progresses for a better and certain understanding by those who have the work in hand.

It will be observed that the contract (letter June 15th) provided that the building should be constructed "substantially as per preliminary sketches heretofore submitted," that complete detailed plans and specifications would be furnished by the defendant at an early date thereafter and that the plaintiff should "use all due diligence in completing said building as rapidly as possible." The preliminary sketches were sufficient, as it turned out, to closely approximate the cost of the building, as shown by Hegg's bid and contract, based on the complete set of plans.

and specifications furnished to White by Weaver late in July or early in August. The preliminary sketches were at the New York office when the contract and lease were signed there on June 27th. The only changes that were suggested by the New York office at that time appear in its telegram of that date quoted above, it said a letter was posted that day "showing revised requirements," and that telegram closed with a direction to the Minneapolis office to start detailed plans and specifications. Mr. Weaver complied with that direction and prepared the detailed plans and specifications which he delivered to White late in July or the first of August. There was nothing in the contract or the telegram that suggested a right or claim on the part of Woolworth Co. to make changes in final plans and specifications. That would be not only an unreasonable attitude, but also in opposition to the intention and understanding of the parties as disclosed in the contract. The approximate cost of the building had been ascertained before the contract was executed, on the preliminary plans furnished by Woolworth Co., and the amount of rent was doubtless fixed on that basis. Those preliminary plans are not in the record, and barring the changes shown in the telegram, supra, it may be fairly inferred from the proof that they exhibited a building substantially as shown by the detail plans and specifications on which final bids were taken. The purpose of the Investment Co. to protect itself against changes from the kind of building shown in the preliminary plans that would substantially increase the cost of the building, is clearly disclosed by its acceptance of the letter of June 15th. And the Investment Co. withheld taking the first step in performance of its obligations under the contract until it had a copy of the telegram which showed changes that would be required by Woolworth Co. from the preliminary plans. That telegram also directed that detail plans and specifications be prepared by Woolworth Co.'s architect. It was reasonable to conclude therefrom that the detail plans and specifications were to be an embodiment of the preliminary plans plus the changes required in the telegram, and as thus prepared they would be the final plans and specifications. The claim, made by plaintiff in error, rests on the contention that the plans and specifications on which bids were taken were not the final plans and specifications because White knew that changes were being made in them, and also knew that nothing that the Minneapolis office did could be final until expressly approved by the New York office. But the facts on which the claim rests were in dispute, as has been seen; and the court submitted to the jury for determination whether, under the disputed facts, the plans furnished to White were the final plans. Treating them as the second set of plans and specifications because of the preliminary sketches that were furnished prior to June 15th, the court on that question instructed the jury:

"If the second set of plans and specifications which were delivered to Mr. White on or about July 27, 1921, were never definitely agreed upon as the plans and specifications to which the contract and lease between the parties should apply and if it was understood that they were tentative only and subject to changes, which should be satisfactory to plaintiff, and if the subsequent changes of those plans and specifications were made pursuant to that agreement, without objection from plaintiff, and if pursuant thereto Mr. White made charges in the building to conform thereto, then no recovery can be had. * * * If the plans and specifications delivered to Mr. White on or about July 27, 1921, then and thereby were or at that time became the accepted plans and specifications to which the contract applied and if the only remaining right on the part of the defendant in reference thereto was to reproduce certain matters of detail on a larger scale and thereby to furnish and provide more satisfactory drawings for the use of those engaged in the work of construction upon said building; if thereafter at the request of the defendant said plans and specifications were changed in substantial particulars and if as a necessary result thereof the cost of the building to plaintiff was substantially increased, then plaintiff is entitled to recover, because if they once agreed upon the plans which were to be the measure of plaintiff's duties, so far as construction was concerned—if the time came when all parties knew and understood that the building to be erected was to be a building in accordance with certain plans and specifications therefor, then those plans became the measure of their respective rights. Plaintiff knew that it was obliged to construct the building in accordance with those plans and specifications. Defendant knew it was bound to accept such a building. If then thereafter and as the result of afterthought, the defendant suggests changes from those plans—changes of a substantial character and which would substantially increase the cost of construction, it was then bound to pay for the changes so made, and if that

shall be your conclusion, your verdict will be for the plaintiff."

[1] The jury was further instructed, if it found for plaintiff on the first count, to deduct from the cost of the changes any increased value to the building at the end of the lease because of these changes. There was no request for separate verdict on each count, and no objection to the verdict rendered as on all counts. The verdict was in effect a finding that the plans and specifications on which bids were taken were the final plans and specifications within the purpose and meaning of the contract, considering the conduct of the parties toward each other under the situation surrounding them. That was an issue of fact, and its determination by the jury must be accepted under the circumstances of the case; there were no exceptions to the court's instructions on that subject or at all, further than it was and is contended that the court erred in overruling a demurrer to the complaint, in submitting the case to the jury, and in refusing to instruct a verdict for defendant. The argument here is that the facts, taken in the most favorable light for plaintiff, did not make a case, either as pleaded or proven, that there was neither a quasi-contract nor an implied contract in fact by which defendant was bound to pay the cost of the changes, and hence there was no legal liability.

[2, 3] It is, of course, a sound principle that ordinarily a landlord cannot hold his tenant for the cost of improvements which the former may make during the term, unless the latter expressly agrees to pay for them. The reason for the rule is plain, and it is just; improvements become incorporated in the premises and redound to the landlord's benefit. But here the parties were in disagreement whether the changes were of any benefit to the landlord, and whether they were not wholly or in part for the sole use and benefit of the tenant. On that issue of fact the verdict was for the plaintiff, and we are not convinced that it is without support under the pleadings and proof. In 13 C. J. 240, 241, 244, this will be found: "The term 'implied contract,' however, as it is ordinarily employed, is broad enough to include both contracts implied in fact and quasi or constructive contracts." In the former "an agreement in fact, creating an obligation, is implied or presumed from" the acts of the parties. "Contracts implied in law, or more properly quasi or constructive contracts are a class of obligations which are imposed or created by law without regard to the assent of the party bound, on the ground that they are dictated by reason and justice, and which are allowed to be enforced by an action ex contractu. They rest solely on legal fiction, and are not contract obligations at all in the true sense, for there is no agreement; but they are clothed with the semblance of contract for the purpose of the remedy, and the obligation arises not from consent, as in the case of true contracts, but from the law or natural equity." We think the plaintiff made a case for the jury within the principle last stated.

[4] One other alleged error is relied upon as ground for reversal. Over objection, Mr. White was permitted to testify that he assumed that Woolworth Co. would pay for the changes if they wanted them made. When the court overruled objection to this testimony it was announced that a like privilege would be granted to the defendant's representatives in the transaction, and Mr. Mickler, as a witness in behalf of defendant, testified that he never had any expectation of paying for any of the changes which were made; and he gave as his reasons therefor that they were to pay $25,000.00 rent, $5,000.00 for taxes, and the building was to be built according to Woolworth Co.'s plans and specifications; that Mr. White did not discuss with him anything during the period of the building of the property until after it was built, and then handed in his bill. Testimony of the intention of the parties is immaterial in an action on a quasi or constructive contract; defendant having availed itself of the alleged erroneous ruling to introduce like testimony in its own behalf ought not to be permitted now to challenge the ruling made against it; but, conceding the action of the court to have been error not waived by the later conduct of defendant, still we are clearly of opinion on a consideration of the whole case that it was not prejudicial to the defendant and that the judgment ought not to be reversed on that ground.

Affirmed.